Filed 8/12/16  P. v. Vasquez-Zapata CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H041908 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS132610A) |
| v. | |
| ETELBERTO VASQUEZ-ZAPATA, | |
| Defendant and Appellant. | |

Following a jury trial, defendant Etelberto Vazquez-Zapata was convicted of first degree murder.  (Pen. Code, §§ 187, subd. (a), 189.)[1]  Defendant appeals from the judgment, arguing that his trial counsel provided ineffective assistance in multiple instances.  He claims that he was denied due process by the exclusion of defense rebuttal evidence.  Defendant also raises alleged instructional error.

We find no reversible error and affirm the judgment.[2]

I

*Procedural History*

A first amended information charged defendant with willful, deliberate, and premeditated murder of Marcos Nava (§§ 187, subd. (a), 189).  It also alleged that in the commission of murder, defendant personally used a deadly and dangerous weapon, a

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] Defendant has also filed a petition for writ of habeas corpus, which we resolve by separate order.

knife, within the meaning, of section 12022, subdivision (b)(1), which caused the offense to be a serious felony within the meaning of section 1192.7, subdivision (c)(23).

Following a jury trial, defendant was found guilty of first degree murder. The jury also found the enhancement allegation to be true. The court sentenced defendant to a total term of 26 years to life.

## II

### *Facts*

Jose Emigdio Terrazas, his wife, Dianaceli Zapata Hernandez, and their children lived with defendant, defendant's wife, and defendant's family for approximately two years. On December 22, 2013, Terrazas and his family were renting a room from defendant in his second story, two-bedroom Seaside apartment located at 933 Hilby Avenue. Hernandez was related to defendant on her father's side.

On December 22, 2013, Ruben Ramos Moya and Nava were working as movers, moving furniture from Seaside to Marina. After work ended at about 3:00 p.m., on their way back, Nava called his friend Terrazas, and Moya and Nava were invited to stop by Terrazas's home. Nava's wife was Terrazas's cousin.

On December 22, 2013, Terrazas worked in the restaurant industry. He was scheduled for work that evening at 5:00 p.m., and he was planning on leaving for work around 4:30 p.m.

Moya and Nava stopped at a store, and Nava purchased a 12-pack of beer. They arrived at Terrazas's apartment by approximately 3:30 p.m. Terrazas provided oysters. The three of them sat together talking, eating, and drinking at kitchen table. A couple of children walked by them.

When defendant came home to the apartment after work at approximately 3:45 p.m., he saw Terrazas drinking with a couple of friends. Nava offered defendant a beer, but defendant declined. Nava asked defendant if he wanted tequila. Defendant said that tequila was better, and he indicated "maybe later." Defendant did not appear to be

2

angry. Moya never heard Nava say "any bad words" to defendant during that December 22, 2013 visit.

Defendant went to his bedroom and then went into the bathroom. Defendant returned to his bedroom.

Defendant's five-year-old son and his six-year-old friend were playing on the apartment's balcony, which had a glass door, while the men were drinking and eating oysters. From the balcony, one could look through the glass door and see the living room and Terrazas and his friends drinking beer and eating oysters at the kitchen table.

Nava drank approximately three to five beers. Moya drank three or four beers. Terrazas drank approximately two to four beers.

About the time Nava and Moya were saying goodbye and leaving, which Terrazas thought was approximately 4:30 p.m., defendant came out of his bedroom. Moya exited the apartment first.

Terrazas saw defendant enter the kitchen, and he heard defendant ask Nava, who was going out the door, to come back into the kitchen. Terrazas could not see defendant because the living room wall blocked his view. Nava, who was carrying a box of empty beer bottles, put the box on the sofa, and he walked into the kitchen.

From outside the apartment, Moya heard defendant call to Nava and tell Nava that he wanted to show Nava something. Within 10 seconds of stepping out of the apartment, Moya heard something hit a wall.

Terrazas was in the living room, where he was saying goodbye to his wife because he was leaving for work. He could see the kitchen table, but he could not see the kitchen sink because a dividing wall obstructed his view.

Hernandez was in the living room working on laundry. Her three-year-old son was with her. She saw defendant come out of the bedroom and go into the kitchen, and she heard defendant call Nava into the kitchen. Nava reappeared, walking backwards; he had nothing in his hands. Defendant "went at" Nava and knocked Nava into the wall in

3

the vicinity of a vacuum cleaner, which was next to the wall between the end of a couch and the kitchen table.

Hernandez heard a bang when defendant knocked Nava into the wall, and she screamed. She told her husband that defendant and Nava were fighting. Terrazas heard some commotion or noise that alarmed him; he saw defendant trying to fight Nava in the vicinity of the vacuum cleaner. Terrazas saw defendant pushing Nava. Nava said, "Calm down, guey."[3] At that point, Terrazas saw blood, but he never saw the knife. Terrazas tried to get between defendant and Nava and separate them. Terrazas grabbed and held defendant.

Hernandez did not see any punches between defendant and Nava. She did not know why defendant "went at" Nava.

Moya had walked down two or three steps of the stairs when Terrazas called for help. Moya returned to the apartment, where he saw Nava on his knees. Moya did not notice any broken glass or a knife.

Terrazas told Moya to get Nava outside. Moya grabbed Nava; when he helped Nava out of the apartment, a lot of blood came out Nava's body. Moya saw a wound in the left side of Nava's chest. Terrazas and Moya helped Nava down the stairs. Defendant stayed in the living room on the couch.

Someone called 911. The call came in at 4:44 p.m., and the reporting party stated that there was a male with a knife in apartment J.

Uriah Allen was a police officer with the City of Seaside. On December 22, 2013, Officer Allen dispatched to 933 Hilby in Seaside. He was the first officer to arrive.

When Officer Allen got there, "it was pretty chaotic." A Hispanic male was lying on the ground outside, and there was a lot of blood on the ground. A group of people were standing around. He saw a lot of blood on the stairs. He went to Apartment J

---

[3] The Spanish word "guey" is like the English word "dude."

4

located on the second story, and he went in. There were "a bunch" of beer bottles lying on the floor, and there was a large amount of blood on them. It appeared to Officer Allen that there had been a struggle based on the blood on the wall and vacuum cleaner and the beer bottles on the ground. He saw a Hispanic woman screaming in Spanish at defendant, who was sitting on the couch in the living room and holding his head with his hands. Officer Allen, who has a little understanding of Spanish, understood that the woman to be asking defendant something like, "[W]hat have you done?" Defendant did not respond.

Officer Allen ordered defendant to lie prone on the ground, which he did, and the officer handcuffed defendant. The officer checked defendant for weapons, and then he placed defendant in a patrol car. By that time, Nava had been placed on a gurney by medical personnel.

Officer Allen returned to the apartment, and he began taking photographs of the apartment. The officer did not see any broken glass. The officer videotaped the scene.

Ryan Miller was a police officer with the Seaside Police Department. On December 22, 2013, Officer Miller arrived at 933 Hilby in Seaside shortly after 4:00 p.m. He blocked off the roadway and assisted in taping off the crime scene. At a later point, he saw fire personnel and an ambulance crew attending to the victim. He monitored defendant, who was detained in a police car.

In the late afternoon on December 22, 2013, Jackie Meroney, who was then a detective for the Seaside Police Department, was called to a crime scene at 933 Hilby Avenue. It was her job to photograph the entire scene.

There were two covered couches in the living room, which was open to the kitchen table area. The first couch was placed along the living room's eastern wall. The second couch, which was perpendicular to the first couch, was set along the living room's northern wall that divided the living room from the kitchen. This second couch protruded into the opening between living room and the kitchen table area. The kitchen

5

table and four chairs, the refrigerator, and a small portion of the kitchen counter could be seen from the living room. An upright vacuum cleaner was standing next to the wall in the living room, adjacent to the northern end of the first couch, close to the kitchen table.

Detective Meroney observed a case of Modelo beer on its side and seven or eight empty beer bottles strewn on the floor inside the doorway to the apartment, next to the southern end of the first couch. She saw no broken glass in the apartment.

A bloody knife was found on the kitchen floor behind the second couch. Its blade was approximately nine or 10 inches long, one and a half to two and a half inches wide, and single edged. The parties stipulated that the blood on the knife belonged to Nava.

There was one open beer bottle, still containing beer, near the corner of the kitchen table. The knife was approximately three feet from that beer bottle on the table. There were no bottles strewn around the kitchen area. No beer was spilled on the table or the floor. The beer bottles lying near the entryway were approximately 15 feet from the knife.

There was a significant amount of blood on the plastic runner in the entryway to the apartment near the southern end of the first couch. There appeared to be blood on the wall next to the vacuum cleaner, the vacuum cleaner, and the couch adjacent to the vacuum cleaner. The knife was approximately five feet from that wall.

Detective Meroney did not see Nava before he was taken away. She never saw defendant in the apartment.

Fredrick Carlin was a detective for the Seaside Police Department. On December 22, 2013, Detective Carlin reported to 933 Hilby Avenue in Seaside at about 5:00 to 5:30 p.m. During his initial walk through the crime scene, he saw a pile of bloody clothing at the bottom of the stairs which belonged to Nava, and he saw blood on the stairs, the outside of the building, the landing, the doormat in front of the door to defendant's apartment, and the plastic runner on the inside of the front door. He saw the Modelo box, the bottles on the plastic runner in the entry, and one bottle of beer on the

6

dining room table. He did not see any broken glass or beer spilled on the floor. It appeared to him, based on the blood on the wall and the beer bottles on the floor, that a struggle or fight had occurred.

At the scene, Detective Carlin interviewed defendant's wife, Hernandez, defendant's teenage daughter, defendant's five-year-old son, his son's six-year-old friend, and Hernandez. He learned that Terrazas had invited Nava and Moya over to drink beer and eat oysters. Terrazas indicated that he had seen defendant punching Nava, but that he did not see the stabbing. Terrazas's wife saw some sort of scuffle against the wall by the vacuum cleaner. None of the witnesses interviewed by the detective said that he or she saw the stabbing. Everything had happened very fast. None of the witnesses told Detective Carlin that he or she saw Nava hit defendant over the head with a beer bottle.

Defendant was initially interviewed in Officer Alex Sakhrani's patrol vehicle, which was equipped with audio-video equipment, and the interview was fully recorded. The recording was played for the jury.

The first officer to speak to defendant on the recording asked defendant in English, "You okay?" Defendant said, "Sure." Defendant was asked his name and where he worked in English, and he answered the questions. In English, the officer asked, "[A]re you hurt at all?" The officer asked in English, "Are you hurt, on your body?" Defendant replied, "No."

Sometime later, the officer said that he was going to unroll the window for defendant. Defendant said he wanted the window closed. The officer said, "How come? Are you hot?" Defendant said, "Yeah." The officer commented that defendant was "breathing hard." The officer asked defendant for his name, and defendant gave his name.

An unidentified male inquired in English, "Are you okay?" Defendant said, "Yeah." The man then asked in English, "Are you hurt at all?" Defendant said, "No." The man asked in English, "You're not hurt at all?" Defendant again said no.

7

Officer Sakhrani, who is a certified Spanish speaker, interviewed defendant. The officer gave defendant *Miranda*[4] warnings in Spanish. Officer Sakhrani's understanding was that defendant had stabbed the victim. Defendant did not appear to have any injuries.

During the recorded interview in the patrol car, defendant indicated that he was tired when he arrived home. The men were drinking at his home, and he was offered a beer. He said he did not want any beer. One of the men told defendant that he was "presumido" or conceited, and the next time he would bring tequila. Defendant understood the remark to mean that he did not "like to hang out" with people like them; defendant became angry. When asked why he pulled a knife on the victim, defendant said that he had lost his mind. Defendant confirmed that he was angry that he had been called conceited and that it had been his intention to harm or injure the person who said that, but defendant denied that he had wanted to kill the victim.

Defendant was asked why he did not fight the victim with his hands and why he grabbed the knife. Defendant explained that he entered the kitchen for a glass of water, and defendant called the victim to come into the kitchen. Defendant said that he grabbed the knife because "[i]t was the first thing there." The knife was "[o]ver where the dishes [were]." The victim did not say anything when he entered the kitchen, and defendant struck him with the knife one time. Defendant did not say anything.

Before the recording ends, an officer is heard saying, "Okay, I am going to turn on the air conditioner and see if that helps you, okay?"

Officer Miller was involved in transporting defendant to the Seaside Police Department, and there the officer collected defendant's clothing for evidence. The officer photographed defendant and each item of clothing. Officer Miller saw no injuries on defendant aside from a small abrasion near his wrist. Defendant had no injuries to his

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436.

face or head. In the jail following defendant's arrest, Detective Meroney swabbed defendant's hands to collect DNA samples.

On December 22, 2013 at the Seaside Police Department, Detective Carlin interviewed Moya and then defendant. Officer Sakhrani assisted the detective with Spanish translation in a number of interviews, including the interview of defendant.

The interview of defendant, which took place in the jail interview room, was video recorded, and it was also audio recorded by the detective's digital hand-held recorder. The audio and video recordings were played for the jury.

At the beginning of defendant's interview at the police station, Officer Sakhrani again gave *Miranda* warnings to defendant. Defendant indicated that when he arrived home after work, he found Terrazas drinking beer with others, including a male relative of Terrazas, whom defendant recognized but whose name he did not know. At this point in the interview, Detective Carlins asked defendant whether he was awake and offered him water.

Defendant indicated to the officers that Terrazas and his friends had not bothered him, but that he was not feeling well when he arrived home. He was tired; he had not slept much because he had been smoking drugs. When defendant was offered a beer, he said he did not want any. Defendant said that he then went to take a shower. After that he went into his bedroom and put gel in his hair.

According to defendant's account, when he subsequently entered the living room, he was offered another beer. One of them indicated that defendant did not want to drink beer with them and said, "You only drink tequila or other more special stuff." Defendant thought he was saying that defendant did not drink with them because defendant wanted something better to drink. Defendant felt like he was being made fun of or mocked, and the remarks bothered him. Defendant said that could not think clearly, and he took the remarks the wrong way; his feelings were hurt.

9

Defendant told the officers that he called to the person who had made the comments to "come," "come here," or "come over here." The person walked over. Defendant claimed that he then lost his memory or consciousness and that he could not see the person or the person's face. Defendant claimed that his "vision went blank." Defendant said that he did not know what happened; he had "already done it." Defendant "was just stabbing him." Defendant saw a lot of blood, including blood on his hand. Defendant "flipped," and he felt dizzy. Defendant became scared. He sat on the sofa or the floor, and the police arrived. Defendant remembered that his wife was crying.

When asked with what he had hit the victim, defendant told the officers that he had grabbed a knife, which was "right there" in the kitchen. He hit the victim once with the knife. Defendant indicated that he had felt bad when he hit the victim and all the blood came out.

The officers repeated what defendant had told them. Defendant corrected the account in that he went into the bedroom to take off his work clothes before taking a shower. After the shower, he went into the bedroom, where he sat on his bed for a while. He left the bedroom to drink water. Defendant claimed that he was again offered beer and that he was told that he was not drinking with them because he drank something better than beer. Defendant became angry because he felt the victim was mocking him and laughing at him. Defendant said something like, "Come, come over, here," and he picked up the knife. Defendant acknowledged seeing the victim, but said he then blacked out and lost his vision and his mind. He said that he did not see where he hit the victim, but he knew he had the knife in his hand.

Defendant remembered the knife had been in a pot; he also remembered grabbing the knife by the handle and turning around toward the victim. He worked as a cook, and he used knives all the time.

Defendant admitted to the officers that he hit the victim with the pointed side of the knife, but he claimed that he was not conscious and that he was not thinking.

10

Defendant said that he did not remember anything after turning around; he again claimed he could not see the victim. Defendant saw the victim's blood after he had already hit the victim. Defendant admitted that the victim had made him really mad. Defendant stated that he "didn't think, and [his] vision blacked out", and that he "couldn't see anything." Defendant claimed that he did not know that he had stabbed the victim because he was not conscious, but he said that he felt that he had hit the victim. Defendant reacted a little bit when he saw the blood. Defendant said that he did not know what happened, and he did not remember anything else. He did not remember whether he held onto the knife.

Defendant recalled somebody grabbing him. Defendant again remembered sitting on the sofa or the floor. He remembered that his wife was asking him what he had done.

Defendant told the officers that he recognized the victim because he had previously visited Terrazas, but defendant did not know his name. Defendant felt bad, and he claimed that he did not want to hurt the victim. He said that he was angry, and he just did it without thinking. He said his memory "blacked out." Defendant did not know whether the victim hit him. Defendant's intention when he called the victim over was to "fight with him." Defendant believed that the victim knew that defendant was going to fight him because defendant was irritated. But defendant acknowledged that the victim did not appear angry and he was smiling.

When asked what kind of drugs he used, defendant replied, "Crystal." He had last used drugs at 9:00 a.m. that morning; he had used "a lot," about one gram. He thought his wife knew that he used drugs. Defendant admitted that he was "hot-tempered." He indicated that he did not have trouble controlling his anger before he started smoking crystal, but when he started smoking he became prone to anger. Defendant stated, "I'm really hot-tempered when I smoke." When asked how long he had been using methamphetamine or crystal, defendant indicated approximately eight years. He acknowledged he had a problem.

11

Defendant was told by Officer Sakrani, "This is your opportunity to say what happened. The truth." Defendant was asked, "[W]hy do you think you . . . did what you did to that guy?" Defendant indicated that he was "not in good shape," that he "wanted to smoke more" crystal, and he was angry because he could not smoke more drugs. Defendant confirmed that he did what he did because he thought he was being made fun of and mocked. When asked whether his intention was to hurt the victim with the knife, defendant replied, "That was the first thing . . . that I grabbed." He thought that if there had been a pistol there and he grabbed it, he would have shot the pistol. Defendant was asked, "Do you want to say anything to his family?" Defendant said that he was "really sorry" for what he had done. Defendant hoped that the victim's family and his own family could forgive him someday.

According to Detective Carlin, defendant appeared conscious and was responsive to the questions during the interview with him. Although defendant claimed to have suffered a blackout or unconsciousness immediately before stabbing Nava in the chest, the detective observed that defendant was able to provide details of what happened. When asked what he did with the knife, defendant had "tapped his chest over his heart" several times.

During the interview at the police station, defendant never indicated to police that Nava had called him a "queer." Defendant never indicated that Nava "puffed his chest out" and said something like, "What are you going to do about that?" Defendant never said that Nava had punched him in the face or hit him over the head with a beer bottle. Defendant never complained that he had been injured. Defendant never gave any indication that a scuffle had occurred before the "knife wound." Defendant never said that he had grabbed the knife in self-defense. Detective Carlin concluded that defendant's motive was anger and that defendant had felt disrespected by Nava.

12

Officer Miller took defendant to the hospital for a blood draw, which was apparently done at approximately 9:59 p.m. on December 22, 2013. A phlebotomist technician drew defendant's blood and then gave the blood sample to Officer Miller.

Stephanie Hopkins worked for the California Department of Justice as a criminologist in the Sacramento toxicology laboratory. She analyzed defendant's blood sample. It tested positive for methamphetamine. It showed 31 nanograms of methamphetamine per milliliter of blood. From her viewpoint as a chemist, a person is "under the influence" of a substance if it is found in the person's system because it is "acting at receptors at some level." She cautioned that she did not know whether that meant defendant was "under the influence" from a legal standpoint. Methamphetamine's half-life, which is the amount of time it takes for the amount in your body to reduce by half, is six to 15 hours.

Hopkins explained that a person who is a chronic user of methamphetamine, which she defined as "someone who uses it daily or multiple times a day," builds up a tolerance to the substance. A gram, which is equal to one thousand milligrams, falls within the range of the amount of methamphetamine typically used by a chronic user. Chronic users may be delusional, may be aggressive, may easily become angry, may have hallucinations or paranoia, and may suffer from psychosis, which means the person is "really not in reality." Even someone who is not a chronic user may have some of those side effects. Clinical indicators of methamphetamine use are elevated blood pressure, elevated pulse rate, increased core body temperature—which means the user gets very hot—and dilated pupils.

Venus Azar, a board certified forensic pathologist with a license to practice medicine in California, testified as an expert. Dr. Azar performed an autopsy on Nava who died at a hospital. Nava had a stab wound to his left upper chest. The stab wound was two and a half inches long and about eight inches deep. Nava also had a fresh abrasion, which was approximately two and half inches by two inches, on his left lower

13

back. An abrasion is a scraping of the skin, and Nava's abrasion could have been caused by a scuffle. Dr. Azar did not see any injury or bruising on or around Nava's knuckles, but the absence of such injury did not foreclose the possibility that Nava was fighting.

Dr. Azar believed the stab wound was consistent with the knife admitted into evidence. The blade passed through Nava's chest, his rib cage, the right ventricle of his heart, his left diaphragm, and his liver, and it transected his pancreas. The blade then "went through a couple of folds in the abdominal cavity . . . and also the mesentery of the large intestine, which supplies blood to the colon." In Dr. Azar's expert opinion, Nava's cause of death was the chest stab wound, which resulted in bleeding and injury to the heart and other organs. He deemed the death to be a homicide. Dr. Azar indicated that not much force was necessary for a large, sharp knife to cut skin and penetrate through organs.

Nava's blood alcohol content at the time of his death was .07. At 9:59 p.m. on the night of the incident, defendant's blood alcohol content was .00.

Prior to December 22, 2013, Nava had attended a couple of parties at defendant's apartment. Terrazas had never seen any kind of animosity, hatred, or ill will between Nava and defendant, and Nava's wife had never observed any problems between Nava and defendant. Terrazas had not heard either man say any "bad words" to, or make any threats against, the other. Terrazas had never heard Nava say anything disrespectful to defendant in Spanish.

*Discussion*

A. *Ineffective Assistance of Counsel*

1. *Legal Standard*

An ineffective assistance of counsel claim has two components. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) "First, the defendant must show that counsel's performance was deficient." (*Ibid*.) "Second, the defendant must show that the deficient performance prejudiced the defense." (*Ibid*.) "Failure to make the required

14

showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." (*Id*. at p. 700.) " 'Surmounting *Strickland*'s high bar is never an easy task.' *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)." (*Harrington v. Richter* (2011) 562 U.S. 86, 105 (*Harrington*).)

"The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690." (*Harrington*, *supra*, 562 U.S. at p. 105.) "Judicial scrutiny of counsel's performance must be highly deferential." (*Strickland*, *supra*, 466 U.S. at p. 689.) "[E]very effort" must "be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (*Ibid*.) "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Ibid*.)

To meet the test for prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid*.) "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies," and, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." (*Id*. at p. 697.)

"In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. [Citations.]" (*Harrington*, *supra*, 562 U.S. at p. 111.) *Strickland*'s prejudice standard "does not require a showing that counsel's actions 'more likely than not altered the outcome,' but

15

the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.' [Citation.] The likelihood of a different result must be substantial, not just conceivable. [Citation.]" (*Id*. at pp. 111-112.)

"It is particularly difficult to prevail on an *appellate* claim of ineffective assistance." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).) The reviewing court is "limited to evaluating the appellate record." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

"On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding. [Citations.]" (*Mai*, *supra*, 57 Cal.4th at p. 1009.)

As discussed below, we reject each of defendant's claims of ineffective assistance of counsel.

2. *Alleged Misuse of Evidence of Methamphetamine Use*

Defendant claims that he was denied effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution because his counsel failed to prevent the prosecution from misusing evidence that he was a methamphetamine addict as bad character evidence. He suggests that his counsel should have raised the issue during pretrial motions and that his counsel should have objected to the prosecutor's argument and requested a curative admonition.

"Evidence of a person's *character*, also known as propensity evidence, is inadmissible to prove conduct in conformity with that character trait. (§ 1101, subd. (a) (section 1101(a)); Cal. Law Revision Com. com., reprinted at 29B pt. 3B West's Ann. Evid. Code (2009 ed.) foll. § 1101, pp. 221-222.) This is the familiar ban on propensity

evidence:  Uncharged conduct generally cannot be admitted to prove the defendant is disposed to commit crimes.  Section 1101(a) codifies this general rule.  Notwithstanding that rule, section 1101, subdivision (b) (section 1101(b)) clarifies that uncharged acts can be admitted for *other* relevant purposes, such as proving motive, opportunity, intent, and so on . . . ."  (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1170-1171, fn. omitted.)

Evidence of defendant's methamphetamine use on the morning of the killing and for the previous eight or so years was relevant to defendant's angry state of mind when he stabbed Nava and his motivation for the stabbing.  "Motive describes the reason a person chooses to commit a crime.  The reason, however, is different from a required mental state such as intent or malice."  (*People v. Hillhouse* (2002) 27 Cal.4th 469, 504 (*Hillhouse*).)  "[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.  [Citations.]"  (*People v. Lopez* (1969) 1 Cal.App.3d 78, 85.)  Although "evidence of motive is not required to establish intent to kill" (*People v. Smith* (2005) 37 Cal.4th 733, 741), "evidence of motive is often probative of intent to kill" (*ibid*.).  A defendant's anger toward the victim can provide motive to kill.  (See *People v. Arcega* (1982) 32 Cal.3d 504, 519.)  The evidence now challenged was not simply bad character evidence, and it was relevant and admissible for the purpose of explaining a source of, and the intensity of, defendant's anger.  (See Evid. Code, §§ 210, 351.)

Generally, in the absence of a request by a party, a trial court has no duty to give an instruction limiting the purpose for which evidence may be considered.  (See *People v. Cowan* (2010) 50 Cal.4th 401, 479; Evid. Code, § 355.)  A counsel's decision whether to request a limiting instruction is a tactical one.  (See *People v. Harris* (2008) 43 Cal.4th 1269, 1290.)  " 'A reasonable attorney may have tactically concluded that the risk of a limiting instruction . . . outweighed the questionable benefits such instruction would provide.'  [Citations.]"  (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1053.)  Here,

17

defense counsel could have reasonably decided not to request such an instruction before trial, or during trial, because such instruction would have focused greater attention on defendant's methamphetamine use. Counsel was arguing that defendant had acted in self defense or in the heat of passion and was downplaying defendant's drug use.

In argument, the prosecutor contended that defendant's motive for the killing was anger, and the sources of defendant's anger were Nava's comments and the methamphetamine. The prosecutor later suggested that the person with a criminal mind is the person who has problems with impulse control and anger and who acts on angry thoughts. He did not mention methamphetamine in connection with those statements. In rebuttal closing argument, the prosecutor made it clear that the prosecution was not asking the jury to find defendant guilty of first degree murder simply because he used methamphetamine.

"[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance. [Citation.]" (*Hillhouse*, *supra*, 27 Cal.4th at p. 502.) Defense counsel could have reasonably decided not to object to the prosecution's arguments concerning methamphetamine because that evidence was relevant and admissible to prove a motive of anger. Defendant admitted that smoking methamphetamine made him more prone to anger and he was angry because he could not smoke more methamphetamine. Expert testimony indicated that using methamphetamine may cause a person to be more easily angered, which also tended to explain why defendant became intensely angry. The record does not reflect that the prosecution used defendant's methamphetamine use as bad character evidence.

In any case, defendant has not shown that defense counsel's failure to seek a pretrial ruling limiting the prosecution's use of the methamphetamine evidence to its relevant and admissible purposes and his failure to object to the prosecutor's argument concerning defendant's methamphetamine use resulted in prejudice. The prosecution did not exploit the evidence of defendant's methamphetamine use as "overly inflammatory

18

bad character evidence." The court instructed the jury regarding its consideration of motive, the presumption of innocence, and the prosecution's burden of proof. Defendant admitted stabbing Nava with a knife, and he told police that he was angry and wanted to injure Nava. Defendant sustained no injuries. There is not a reasonable probability that the result of the proceeding would have been more favorable to defendant if defense counsel had affirmatively sought to restrict the prosecution's use of the methamphetamine evidence to its proper scope. (See *Strickland*, *supra*, 466 U.S. at p. 694.)

3. *Failure to Secure Instructions Related to Methamphetamine Use*

Defendant asserts that he was denied effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution when his counsel failed to secure an instruction on voluntary intoxication (CALCRIM No. 625) and a limiting instruction concerning the evidence of his drug use (CALCRIM No. 375).

a. *CALCRIM No. 625*

Defendant argues that his trial counsel acted deficiently by failing to request CALCRIM No. 625, the instruction explaining the extent to which a jury may consider a defendant's voluntary intoxication. The People suggest that defense counsel did not act incompetently because the evidence did not warrant such instruction and that "[e]ven had defense counsel requested the instruction on voluntary intoxication, the trial court would properly have refused it because no substantial evidence supported giving the instruction."

CALCRIM No. 625 informs a jury that any evidence of the defendant's voluntary intoxication may be considered "only in a limited way," specifically only in deciding whether the defendant acted with an intent to kill, the defendant acted with deliberation and premeditation, the defendant was unconscious when he acted, or other specific intent

19

required in a homicide charge. It states: "You may not consider evidence of voluntary intoxication for any other purpose."[5]

CALCRIM No. 625 is effectively a limiting instruction, which tells a jury that it may consider any evidence of defendant's voluntary intoxication "in only a limited way" and for no "other purpose" than the purposes specified. In this case, defense counsel could have reasonably concluded that the instruction would not have been helpful to defendant.

In any case, assuming that the evidence warranted the giving of the instruction, we discern no prejudice. The jury was not instructed to disregard the evidence of defendant's voluntary intoxication in assessing defendant's intent and mental state when he stabbed Nava. Rather, the court instructed: "You must decide whether a fact and issue has been proved based on *all of the evidence*." (Italics added.) "[A]ll of the evidence" included evidence that defendant had used one gram of methamphetamine on the morning of the killing and that he still had methamphetamine in his system when his blood was drawn later that day. The court fully instructed the jury on the presumption of innocence and on the prosecution's burden to prove defendant guilty beyond a reasonable doubt. The jury was also told that "[t]he People must prove, not only that the defendant did the acts charged, but also that he acted with a particular intent or mental state." The

---

[5] Section 29.4 states in part: "(a) No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition. Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. [¶] (b) Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." Under current law, "voluntary intoxication, even if it induced unconsciousness, is not a defense to crime as such, though it may be relevant to whether the defendant formed a specific intent necessary for its commission. [Citations.]" (*People v. Boyer* (2006) 38 Cal.4th 412, 469.)

jury received instruction on the intents or mental states necessary to find defendant guilty of first degree murder under the prosecution's theories and on lesser homicide offenses. There is not a reasonable probability that defendant would have obtained a more favorable outcome had the court given CALCRIM No. 625 upon his counsel's request.

b. *CALCRIM No. 375*

Defendant argues trial counsel rendered ineffective assistance by failing to request that the jury be instructed with CALCRIM No. 375, which is in part a limiting instruction. That instruction would have provided that evidence of uncharged acts (defendant's methamphetamine use) may be considered only for limited purposes, presumably in this case for the purpose of deciding defendant's motive in stabbing Nava. According to defendant, instruction with CALCRIM No. 375 "would have provided the jury with a legal basis to reject the prosecution's subsequent unlawful arguments urging the jury to use this evidence as bad character evidence."

As indicated, the prosecutor did not make a bad character argument based on defendant's methamphetamine use. He did not intimate that defendant's use of methamphetamine reflected his bad character, from which it could be inferred that defendant had a general disposition to commit murder or violent crime. The prosecutor's brief comment regarding the "criminal mind" was not tied to defendant's use of methamphetamine.

Since defendant was claiming that he had acted in self-defense or heat of passion, defense counsel could have reasonably made the tactical choice not to request a limiting instruction because he did not want to draw further attention to defendant's methamphetamine use. (See *People v. Hinton* (2006) 37 Cal.4th 839, 878 [failure to request a limiting instruction concerning prior murder conviction not ineffective assistance because "counsel may have deemed it unwise to call further attention to it."]) In addition, an instruction pursuant to CALCRIM No. 375 would have explicitly told the jury that, if it found defendant had committed those uncharged acts, it could consider the

21

evidence to decide whether defendant had the motive to commit the offenses alleged. Defense counsel could have reasonably concluded that he should not request the instruction because it would explicitly link the jury's consideration of defendant's methamphetamine use to defendant's motive and would not help defendant.

Even if we assume that defense counsel should have asked the court to give CALCRIM No. 375, we find no possibility of prejudice from his failure to request it in light of the strength of the evidence, the absence of any argument employing the evidence defendant's methamphetamine use as bad character evidence, and the court's jury instructions. (*Strickland*, *supra*, 466 U.S. at pp. 687, 694, 697, 700.)

4. *Failure to Object to the Prosecutor's Closing Argument*

a. *Background*

Defendant asserts that, with regard to the alleged instances of prosecutorial misconduct, there was "no reasonable, professionally competent, tactical basis for defense counsel to fail to object and seek a cure."

"Regarding the scope of permissible prosecutorial argument, . . . ' " 'a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.' [Citation.] 'A prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness' " [citation], and he may "use appropriate epithets . . . ." ' " [Citation.]' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 819 (*Hill*).) The prosecutor "has the right to fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper" (*People v. Lewis* (1990) 50 Cal.3d 262, 283 (*Lewis*)), even if his "reasoning is faulty or the deductions are illogical." (*Ibid.*)

22

" ' "A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.]" ' (*People v. Clark* (2011) 52 Cal.4th 856, 960.) Even when the misconduct does not attain that level, it may be error under state law, but ' " 'only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, . . . ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' [Citation.]" ' (*People v. Linton* (2013) 56 Cal.4th 1146, 1205 (*Linton*).)" (*People v. Mendoza* (2016) 62 Cal.4th 856, 905.)

" '[T]he decision facing counsel in the midst of trial over whether to object to comments made by the prosecutor in closing argument is a highly tactical one . . . .' [citation], and 'a mere failure to object to evidence or argument seldom establishes counsel's incompetence' [citation]." (*People v. Centeno* (2014) 60 Cal.4th 659, 675 (*Centeno*).)

b. *Argument Invoking the Authority of the Appellate Courts*

In his closing argument, defense counsel argued that defendant had acted in the heat of passion, stating that "if you read the transcript, yes, [he] went blank, he didn't have any consciousness, and he grabbed a knife to defend himself, and that's what happened in this case." But defense counsel never asserted a defense of unconsciousness to first degree murder, presumably because defendant was able to describe in detail what had occurred.

In his rebuttal argument, the prosecutor told the jury that he wanted to read some language from a court of appeal, and then proceeded to state: "Generally, a defendant's inability to remember or his hazy recollection does not supply an evidentiary foundation

for being unconscious.  The inability of a defendant to remember is of such common occurrence and so naturally accountable, for upon the normal defects of memory or what is more likely the intentional denial of recollection."**[6]**

In *People v. Jasso* (2012) 211 Cal.App.4th 1354 (*Jasso*), the defendant contended that "the prosecutor repeatedly committed misconduct during his closing argument to the jury, in violation of state law and the due process guaranty contained in the Fifth and Fourteenth Amendments to the United States Constitution."  (*Id*. at p. 1361.)  This court considered, among other alleged misconduct, the prosecutor's statements suggesting that "the California Supreme Court and California Court of Appeal had upheld guilty verdicts on facts the prosecutor viewed as comparable to those of this prosecution."  (*Id*. at p. 1363.)  We stated:  "The California Supreme Court and the California Court of Appeal are, respectively, the highest and second-highest echelons of the state court system.  The prosecutor erred in invoking their authority.  He should not have invoked the authority of any court that one or more jurors could surmise outranks the trial court.  A fortiori, he should not have implied that the California Supreme Court would expect the jury to return a guilty verdict."  (*Id*. at pp. 1366-1367.)  Although we determined that the prosecutor had improperly invoked the authority of the higher courts, we concluded that

---

**[6]** No single case contains defense counsel's statements verbatim.  It appears that the statements may have been derived from the comments following the standard instruction on unconsciousness, which state in part: "Generally, a defendant's inability to remember or his hazy recollection does not supply an evidentiary foundation for a jury instruction on unconsciousness.  (*People v. Heffington* (1973) 32 Cal.App.3d 1, 10); *People v. Sameniego* (1931) 118 Cal.App. 165, 173 ['The inability of a defendant . . . to remember . . . is of such common occurrence and so naturally accountable for upon the normal defects of memory, or, what is more likely, the intentional denial of recollection, as to raise not even a suspicion of declarations having been made while in an unconscious condition.'].)  In *People v. Coston* (1947) 82 Cal.App.2d 23, 40-41, the court stated that forgetfulness may be a factor in unconsciousness; however, 'there must be something more than [the defendant's] mere statement that he does not remember what happened to justify a finding that he was unconscious at the time of that act.' "  (CALCRIM No. 3425 (2014 ed.) p. 933, Com. on Related Issues.)

the error was nevertheless harmless based upon the strength of the evidence. (*Id*. at pp. 1369, 1372-1373; see *id*. at p. 1380 [conc. opn. of Mihara, J.].)

Unlike the prosecutor's remarks in *Jasso*, the prosecutor in this case did not imply that the California courts would expect the jurors to find defendant guilty under the evidence presented. The prosecutor's recitation did imply, however, that Courts of Appeal generally find that a defendant's inability to remember or hazy recollection is attributable to "the normal defects of memory" or even more likely attributable to the defendant's "intentional denial of recollection."

We agree that the prosecutor improperly attempted to add the appellate courts' imprimatur to his view of the evidence, but his comments did not amount to a violation of due process or render the trial fundamentally unfair. Defense counsel could have reasonably chosen not to object because defendant was not asserting a claim of unconsciousness and defense counsel did not want to focus the jurors' attention on what defendant had told police.

In any case, defendant has not met his burden of establishing prejudice. A defense of unconsciousness was not consistent with defendant's theories of the case, which were self-defense and heat of passion. The prosecutor was free in any case to argue that defendant's reported memory loss or unconsciousness was not credible. Further, the trial court fully instructed the jury on its duty to determine the facts and assess the credibility of witnesses pursuant to standard instructions.[7] There is not a reasonable probability that

---

[7] The court told the jury: "You must decide what the facts are. It is up [to] all of you and you alone to decide what happened based only on the evidence that has been presented to you in this trial." It instructed: "You alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience." The court explained that "[i]n evaluating a witness' testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony." The jury was told that one of the factors it could consider in judging the credibility or believability of a witness was how well the witness was able to remember and describe what happened. The court reiterated: "You are the (continued)

25

defendant would have obtained a more favorable outcome if counsel had objected to the prosecutor's invocation of Court of Appeal decisions and requested a curative admonition. (*Strickland*, *supra*, 466 U.S. at p. 694.)

c. *Arguments Regarding Provocation*

Defendant contends that the prosecutor misstated the law in closing argument by telling the jury that "words alone" cannot constitute legal provocation and by indicating that the provocation must be sufficient to cause an ordinary person of average disposition to kill.

There was evidence indicating that Nava had used words that provoked defendant's anger. Defendant told police that he had been called conceited because he did not want to drink beer with Nava and the others. Defendant also said that he felt that Nava was making fun of him and mocking him when he said defendant wanted to "only drink tequila or other more special stuff". Defendant testified at trial, when he called Nava into the kitchen, Nava asked him, "You're going to beat me up or something fagget [*sic*]" or "queer."

In his initial argument, the prosecutor suggested that everyone has experienced being insulted and then having the natural reaction of wanting to strangle the offender, but the "normal rational thinking" person does not act on that thought while a criminal "puts [thought] into action." In rebuttal closing argument, the prosecutor stated that the only provocation in this case was "words alone" and that, under California law, "[w]ords alone do not amount to provocation." The prosecutor explained: "[T]he reason for that . . . is that law-abiding citizens to common thinking people, when somebody calls you names, that doesn't justify you to attack them. That's common sense."

_____

sole judges of the evidence and believability of witnesses. It is up to you, and you alone, to decide the issues in this case."

Defendant maintains that the "words alone" argument constituted prosecutorial misconduct.  We agree that the prosecutor misstated the law because words may be sufficient provocation, depending upon the circumstances.  "The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.  [Citations.]"  (*People v. Moye* (2009) 47 Cal.4th 537, 550.)

Defense counsel nevertheless could have reasonably decided not to object to the "words alone" argument because the defense theory was not that words alone had provoked defendant.  Moreover, defense counsel could have reasonably concluded that the words spoken by Nava did not appear to be sufficient in themselves to provoke an ordinary person of average disposition to act rashly or without due deliberation and reflection.[8]  In closing argument, defense counsel argued that the victim had provoked defendant by punching him and starting a fight.

Defendant also asserts that the prosecutor improperly suggested that the provocation necessary for manslaughter is provocation that would have caused an ordinary person of average disposition to kill.  The prosecutor did not actually say or imply that, and there is no reasonable likelihood that the jurors would have understood the prosecutor to have said that.

---

[8] The California Supreme Court has "rejected arguments that insults or gang-related challenges would induce sufficient provocation in an *ordinary* person to merit an instruction on voluntary manslaughter.  (*People v. Avila* (2009) 46 Cal.4th 680, 706-707; see also *People v. Manriquez* (2005) 37 Cal.4th 547, 586.)"  (*People v. Enraca* (2012) 53 Cal.4th 735, 759.)  In *People v. Manriquez*, *supra*, at p. 547, evidence that the victim called the defendant a "mother fucker" and taunted the defendant by repeatedly asserting that, if the "defendant had a weapon, he should take it out and use it," was insufficient to support an instruction on voluntary manslaughter based upon the theory of a sudden quarrel or heat of passion.  (*Id*. at p. 586.)  In *People v. Najera* (2006) 138 Cal.App.4th 212, an appellate court concluded that calling the defendant a "faggot" was not sufficient to "cause an ordinary person to lose reason and judgment under an objective standard." (*Id*. at p. 226, fn. omitted.)

27

" '[W]e "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]' (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)" (*Centeno*, *supra*, 60 Cal.4th at p. 667.) "If the challenged comments, viewed in context, 'would have been taken by a juror to state or imply nothing harmful, [then] they obviously cannot be deemed objectionable.' (*People v. Benson* (1990) 52 Cal.3d 754, 793.)" (*People v. Cortez* (2016) 63 Cal.4th 101, 130.)

In any case, defendant has not established prejudice. In closing argument, defense counsel reviewed the law regarding voluntary manslaughter, including the requirement that "the provocation would have caused a person of average disposition to act rashly without due deliberation." The court fully instructed on voluntary manslaughter under a heat of passion theory, including the requirement that the provocation of the defendant "would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment." The court stated that "[i]n order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it." It told the jury that "no specific type of provocation is required" and that the jury "must decide whether the defendant was provoked and whether the provocation was sufficient." It stated that "[i]n deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment."

The jury was instructed to follow the law as the court explained it regardless of any attorney's inconsistent comment on the law. "We presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade." (*People v. Clair* (1992) 2 Cal.4th 629, 663, fn. 8.)

28

On the record, there is no reasonable probability that defendant would have obtained a more favorable result at trial if his counsel had objected to the prosecutor's arguments related to provocation and requested curative admonitions. (*Strickland*, *supra*, 466 U.S. at p. 694.)

d. *Argument Regarding First Degree Murder by Lying in Wait*

The prosecutor explained that the People had two first degree murder theories: first degree murder by lying in wait and premeditated and deliberate murder. The prosecutor went over the elements of first degree murder by lying in wait. He indicated that defendant could be guilty of first degree murder by lying in wait even if he did not have the intent to kill. The prosecutor argued: "So let's say some of you are thinking in terms of implied malice, [defendant] didn't want to, didn't intend to kill him, but now we're going to go to first degree murder by lying in wait. How does this work? There's some language from a [C]ourt of [A]ppeal case I'd like to read for you, because I cannot say it any better. 'The act of lying in wait with secret purpose in order to gain advantage and take a victim unawares is particularly repugnant and of aggravated character so as to justify harsher punishment. When the lying in wait results in murder, even if the waiting and watching were not done with the intent to kill, an accused who committed murder perpetrated by means of lying in wait is guilty of first degree murder even if the accused did not have the premeditated intent to kill.' "

Defendant now asserts that, in discussing murder by lying in wait, the prosecutor committed misconduct by invoking the authority of a higher court and raising the issue of harsher punishment. He also complains that the language was "an improper invitation to allow 'emotion [to] reign over reason.' "

The prosecutor may have intended to merely explain the general penological justification for convictions of first degree murder by lying in wait. The prosecutor crossed the line, however, by referring to punishment. "At the guilt phase, '[a] defendant's possible punishment is not a proper matter for jury consideration.' (*People v.*

*Holt* (1984) 37 Cal.3d 436, 458.)" (*People v. Martinez* (2010) 47 Cal.4th 911, 958.) In addition, he should not have invoked the authority of a higher court in closing argument. (See *Jasso*, *supra*, 211 Cal.App.4th at pp. 1366-1367.)

Defendant has not shown, however, that there could be no conceivable tactical reason for not objecting to the prosecutor's remarks regarding murder by lying in wait, which did not mention any particular punishment, did not tell the jury to consider punishment in reaching its verdict, and did not misstate the penological underpinnings of the offense. As the California Supreme Court states, "[t]he moral culpability of the offender who murders by lying in wait justifies fixing the murder in the first degree. [Citations.]" (*People v. Stanley* (1995) 10 Cal.4th 764, 795.) Moreover, the remarks now challenged were not an appeal to the jury's passions. Rather, they appear aimed at addressing any doubt jurors might have in finding defendant guilty of first degree murder by lying in wait, even if they found that defendant had not intended to kill.

In any case, defendant has not established the prejudice component of an ineffective assistance claim. The prosecutor did not urge the jurors to consider punishment at the guilt phase, and there is no reasonable likelihood that the prosecutor's comments misled the jury to believe that punishment could be considered in reaching its verdict. The court's instructions after closing arguments directed the jury to reach its verdict "without any consideration of punishment." The court fully instructed the jury regarding the requirements for proving first degree murder by lying in wait and the jury's responsibility as the trier of fact. (See fn. 6, *ante*.) This court presumes that the jury understood and followed those instructions. (See *People v. Stevens* (2007) 41 Cal.4th 182, 206.) Defendant has not shown that there is a reasonable probability that he would have obtained a more favorable result if defense counsel had objected to the prosecutor's improper remarks. (*Strickland*, *supra*, 466 U.S. at p. 694.)

e.  *Argument Regarding Time Required to Premeditate, Deliberate, or Lie in Wait*

The prosecutor told the jurors that "[w]e think . . . of premeditation and deliberation, lying in wait, as requiring some time, some duration."  He indicated that, unlike the movies where a criminal comes up with a "diabolic[al]" plan, such thinking can happen quickly.  He said that "if you were to come to court every day and watch what goes on in these courtrooms, the mundane, everyday criminal thinks up these things pretty quickly."  To show how fast a person can premeditate, the prosecutor talked about how fast a driver decides whether to go through a traffic signal that has turned yellow.

Defendant complains that "[t]he prosecution presented his personal opinion [that most criminals premeditate quickly] as if it contained superior and specialized knowledge about premeditation and deliberation" and that the prosecutor improperly acted as his own expert witness and improperly relied on facts not in evidence.  Of course, "prosecutors should not purport to rely in jury argument on their outside experience or personal beliefs based on facts not in evidence.  [Citations.]" (*People v. Medina* (1995) 11 Cal.4th 694, 776 (*Medina*).)

Defendant has not shown, however, that his counsel could not have reasonably elected not to object for tactical reasons.  The prosecutor's general message that premeditation can occur quickly was consistent with existing law.  " 'The process of premeditation and deliberation does not require any extended period of time.  "The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." [Citations.]' [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)

In any case, the defendant has not established prejudice.  The prosecutor did not refer to facts not in evidence concerning defendant's conduct.  As indicated, the trial court admonished the jury that "[n]othing that the attorneys say is evidence," the jurors are "the sole judges of the evidence," and  the court's instructions prevail over the

31

attorneys' comments on the law. The court instructed the jury: "The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of reflection, not the length of time." As to lying in wait, the court instructed: "The lying in wait does not need to continue for any particular period of time, but its duration must be substantial enough to show a state of mind equivalent to deliberation or premeditation. Deliberation means carefully weighing the considerations for and against a choice and, knowing the consequences, deciding to act. An act is done with premeditation if the decision to commit the act is made before the act is done."

Based on the record, there is not a reasonable probability that defendant would have obtained a more favorable result if defense counsel had objected to the prosecutor's comment about his personal observations concerning the speed with which criminals who are tried in Monterey County ordinarily premeditate. (*Strickland*, *supra*, 466 U.S. at p. 694.)

f. *Argument Indicating That This Case was* "*Open and Shut*" *and* "*Black and White*"

In his initial argument, the prosecutor stated: "[Y]ou might be asking right now, why in the heck are we here? If this case is so open and shut, so, you know, he confessed. Why are we here? We really don't need to be here. We're here because this man has a right to a trial. He has a right to his day in court. It's our obligation to prove it. That's what we're doing here." The prosecutor also commented: "You come here every day, and you will see it's black and white. Some people go ahead and ask for a trial. We give it to him."

32

Defendant asserts that it was misconduct for the prosecutor to act as his own expert witness by presenting his own opinions about "the 'open and shut' nature of real-life criminal cases" and for him to appeal to the jurors' passions by suggesting that defendant had confessed and the trial was waste of the jurors' time. "[I]t is misconduct for prosecutors to vouch for the strength of their cases by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it. [Citations.] Specifically, a prosecutor's reference to his or her own experience, comparing a defendant's case negatively to others the prosecutor knows about or has tried, is improper. [Citation.] Nor may prosecutors offer their personal opinions when they are based solely on their experience or on other facts outside the record. [Citations.]" (*People v. Huggins* (2006) 38 Cal.4th 175, 206-207 (*Huggins*).)

Although defendant did not confess to committing first degree murder, the prosecutor's reference to defendant's supposed confession was not misconduct. Here, defendant did not dispute that he fatally stabbed defendant. He admitted the basic facts to police: he was feeling angry and he believed Nava was mocking him, he called Nava into the kitchen, he grabbed a knife, and he stabbed Nava. During the interview at the police station, defendant expressed the hope that he would be forgiven someday. The prosecutor's reference to defendant's so-called confession merely reflected reasonable inferences based on those admissions. In answering a hypothetical juror's question about why try an "open and shut" case, the prosecutor explained that a defendant has a right to a trial. We discern no prosecutorial misconduct in the foregoing respects. The prosecutor did not insinuate that the trial was a waste of time. We agree, however, that the prosecutor improperly intimated that this case was "black and white" as compared to or like most criminal cases that he encounters in his daily experience. (See *Huggins*, *supra*, 38 Cal.4th at pp. 206-207.)

Defense counsel could have reasonably concluded that an objection would not be helpful because the essence of the prosecutor's argument was that this was a

straightforward, clear-cut case and those were proper arguments. (See *Lewis*, *supra*, 50 Cal.3d at p. 283.) In any case, defendant has not demonstrated prejudice. In light of the strength of the evidence and the court's thorough instructions to the jury, there is no reasonable probability that defendant would have obtained a more favorable result if defense counsel had objected to the prosecutor's remarks and requested a curative admonition. (*Strickland*, *supra*, 466 U.S. at p. 694.)

g. *Argument Regarding Election Not to Recall Two Witnesses on Rebuttal*

In initial closing argument, the prosecutor noted defendant's testimony that the victim called him a "queer." The prosecutor suggested that defense counsel could have questioned Terrazas, and perhaps his wife, during cross-examination about what they heard, but defense counsel had not done so. The prosecutor acknowledged that he had not recalled Terrazas as a rebuttal witness and asked him, "[D]id you hear the word queer or something?" The prosecutor explained that the prosecution did not have to "turn over every little pebble in this case" and there was more than enough evidence for the jury to convict defendant as the evidence stood.

Defendant contends that the prosecutor committed prejudicial misconduct during his closing argument by referring to facts not in evidence. " ' "[S]tatements of facts not in evidence by the prosecuting attorney in his argument to the jury constitute misconduct." [Citations.]' [Citations.]" (*Linton*, *supra*, 56 Cal.4th at p. 1207.) But in this case the prosecutor did not tell the jury how Terrazas and his wife would have answered if they had been recalled to testify. The prosecutor's comments merely explained that he was not required to present all conceivable testimony and logical witnesses, and that in his view, the evidence was more than sufficient to meet the People's burden of proof without such testimony. He did not allude to facts not in evidence. Accordingly, defense counsel did not perform deficiently in not objecting to that argument and there was no prejudice to defendant caused by defense counsel's failure to so object.

34

h. *Argument Involving Alleged Kurtzman Error*

In closing argument, the prosecutor indicated that he prepared the verdict forms, which he showed to the jury, and he said, "Let me show you how this works. This is a verdict form." The prosecutor told the jurors that the court would be giving them verdict forms for first degree murder, second degree murder, and voluntary manslaughter. He told the jury that it should first consider the verdict form for first degree murder and that it should move to the verdict form for second degree murder only "if you all agree it's not murder one." The prosecutor also informed the jury that "[t]he only way you get to decide if it's voluntary manslaughter is if you all agree that it's not murder one or murder two."

In rebuttal closing argument following the defense argument, the prosecutor told the jury that it would be receiving a jury instruction that some of the instructions may not apply, depending upon the jury's factual findings. As an example, he suggested that an involuntary manslaughter instruction "might not apply if you don't think the facts justify involuntary manslaughter."[9] The prosecutor then stated: "You can take an instruction and put it aside if you don't think it's there. You don't have to say, well, we got this, we got to do something with this. You can reject it if you think the facts don't supply that."

In *People v. Kurtzman* (1988) 46 Cal.3d 322 (*Kurtzman*), the California Supreme Court "explained that in all trials of included offenses, 'the jury must acquit of the greater offense before returning a verdict on the lesser included offense,' although it can consider or discuss the offenses in any order it chooses. (*Id.* at p. 330.)" (*People v. Anderson* (2009) 47 Cal.4th 92, 114.) "The acquittal-first rule protects a defendant from retrial when the jury agrees that the greater offense was not proven but cannot agree on a lesser included offense. Without the rule, a general declaration of mistrial would disguise the

---

[9] Defendant assumes that defense counsel said "voluntary manslaughter" rather than "involuntary manslaughter" as reflected in the reporter's transcript.

fact that the jury agreed the defendant was not guilty of the greater offense, making the defendant subject to retrial on both the greater and lesser offenses." (*Ibid*.)

"[A] court may restrict a jury from returning a verdict on a lesser included offense before acquitting on a greater offense, but [the court] may not preclude it from considering lesser offenses during deliberations. [Citations.] Thus, a trial court should not tell the jury it must first unanimously acquit the defendant of the greater offense before deliberating on or even considering a lesser offense. [Citation.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 536.)

Defense counsel could reasonably anticipate that the court would fully instruct the jury regarding the applicable law as it did, and he could have reasonably concluded that no objections were necessary because the jury was not likely to misconstrue the prosecutor's remarks. "[A] mere failure to object to . . . argument seldom establishes counsel's incompetence. [Citations.]" (*People v. Ghent* (1987) 43 Cal.3d 739, 772.) In any case, defendant fails to demonstrate prejudice necessary to establish ineffective assistance of counsel. (*Strickland*, *supra*, 466 U.S. at p. 694.)

Before the trial began in this case, the court told the jurors: "It is my duty to instruct you on the law, and it is your duty to follow the law as I state it to you now, throughout the trial, and at the conclusion of the evidence." As part of its general jury instructions following closing argument, the court instructed the jurors that they must follow the law as the court explained it, and, if they believed that the attorneys' comments on the law conflicted with instructions, they were required to follow the court's instructions. It directed the jurors to "[p]ay careful attention to all of these instructions and consider them together."

The trial court told the jury: "Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction, that I am suggesting anything about the facts. After you have

36

decided what the facts are, follow the instructions that do apply to the facts as you find them."

As to verdict forms and jury deliberations, the trial court instructed: "You will be given verdict forms for guilty and not guilty of first degree murder, second degree murder, and voluntary manslaughter. [¶] *You may consider these different kinds of homicide in whatever order you wish.* But I can accept a verdict of guilty or not guilty of second degree murder only if all of you have found the defendant not guilty of first degree murder, and I can accept a verdict of guilty or not guilty of voluntary manslaughter only if all of you have found the defendant not guilty of both first and second degree murder. [¶] To return a verdict of guilty or not guilty on a count, you must all agree on that decision." (Italics added.)

It is not reasonably likely that the jury construed the prosecutor's remarks in a manner contrary to *Kurtzman*. It is reasonably likely that the jury understood the word "decide" in the context of a discussion of verdict forms to refer to its decision of guilty or not guilty recorded on a verdict form and not to its consideration of the evidence and its deliberations on defendant's culpability beforehand.

The voluntary manslaughter instructions stated that the jury must find defendant not guilty of murder if the People had not met their burdens of proving beyond a reasonable doubt "that the defendant did not kill as a result of as sudden quarrel or in the heat of passion" and "that the defendant was not acting in imperfect self-defense." It is not reasonably likely that the jurors understood the prosecutor's arguments regarding the verdict forms and the applicability of instructions as suggesting that they disregard the voluntary manslaughter instructions and, thereby, ignore the People's burden "to disprove manslaughter."

Defendant seems to imply that the alleged *Kurtzman* error was compounded by other alleged instances of prosecutorial misconduct. He asserts that the prosecutor improperly referred to facts outside the record and claimed to have expertise when he told

37

the jurors that he "prepared these verdict forms" and he would show them "how this works." But the prosecutor also repeatedly indicated to the jurors that the judge would be instructing them. In addition, the prosecutor had said at an earlier point: "By the way, when I give you all this law . . . , I do it [in] a sort of summary fashion to give you an idea on how to think about this. But the law that the Judge gives you is the final product. You will get printed versions in the jury room. So of course, the Judge's law is paramount . . . ."

Even assuming that the prosecutor was attempting to inappropriately bolster his esteem in the eyes of the jury by indicating that he prepared the verdict forms, defense counsel could have reasonably decided that the transgression was so minor that no useful purpose would be served by objecting to the fleeting remark. (See *People v. Padilla* (1995) 11 Cal.4th 891, 958, overruled on another ground in *Hill*, *supra*, 17 Cal.4th at p. 823, fn. 1.) Moreover, as previously indicated, the trial court instructed the jury that "[n]othing that the attorneys say is evidence" and "their remarks" made in closing argument "are not evidence." Defendant has not established that prejudice resulted from his counsel's failure to object to the prosecutor's isolated remark about preparing the verdict forms. (*Strickland*, *supra*, 466 U.S. at p. 694.)

Defendant further claims that, when the prosecutor digressed from his discussion of the verdict forms, he "provided a legally erroneous example of the 'difference between murder and manslaughter' " by asserting that angrily plunging a pen into someone with the intent to injure would be manslaughter whereas angrily stabbing a person with a knife would be murder because it would reflect the perpetrator's conscious disregard for human life. The prosecutor suggested that not many people would think a pen could kill. He remarked that sometimes a reasonable person could think, "[H]e died from that? How did that happen?" and that, in some instances, "no reasonable person would think that this could kill you." Defendant asserts that the prosecutor set up his "own legal standard of

voluntary manslaughter (i.e. 'no reasonable person would think that this could kill you')" and that he misstated "the law of heat-of-passion voluntary manslaughter."

Defendant has not shown that his counsel acted incompetently when he did not object to the foregoing aspects of the prosecutor's argument. The prosecutor was merely illustrating the concept of "conscious disregard of human life" using an example from common experience. (See *People v. Brown* (2004) 33 Cal.4th 382, 399-400.) He was not purporting to lay out the law of voluntary manslaughter. In any case, defendant has not established the prejudice prong of an ineffective-assistance-of-counsel claim. (*Strickland*, *supra*, 466 U.S. at p. 694.) The court fully instructed the jury on the applicable law, the fact that its instructions prevailed over counsel's comments on the law, and the jury's duty to decide the facts and to follow the instructions that applied to the facts that it found.

i. *Argument Concerning the Criminal Mind*

During his closing argument, the prosecutor made the following remarks: "Everybody in this room has at some point been insulted, been offended had their feelings hurt. . . . And the natural reaction is, I'd like to strangle that person. That's the thinking. But you stop there. . . . Or you [maybe] confront the person, hey, what's up? Why are you hassling me? Or you drop it. That's the normal reaction of the normal rational thinking. [¶] The criminal mind, the person who has problems with impulse control, problems with anger, problems with doing things wrong, making bad choices, he runs through that red light. He takes that action. He takes that thought. Produces some thinking, some planning, and puts it into action. That is criminal act. It is strange to people who, right-thinking people like ourselves, it is strange. But it happens."

Defendant argues that the prosecutor resorted to inflammatory rhetoric "by telling the jury that the 'criminal mind' is unlike the mind of 'right thinking people like ourselves,' which explains why they commit inexplicable 'criminal act[s].' " He asserts that, in making the improper inflammatory remarks, the prosecutor was improperly acting

39

as his own expert witness and that the prosecutor was "preying upon the jurors' fears, biases, and loathing for drug addicts."

" 'It is, of course, improper to make arguments to the jury that give it the impression that "emotion may reign over reason," and to present "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response." [Citation.]' (*People v. Padilla* (1995) 11 Cal.4th 891, 956-957, overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)" (*Linton*, *supra*, 56 Cal.4th at p. 1210.) It is not "proper to appeal to the passions and prejudices of the jury." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1342 (*Seumanu*).)

In *People v. Sanchez* (2014) 228 Cal.App.4th 1517, which defendant cites, the prosecutor argued that "defendant hopes that 'one of you' will be 'gullible enough,' 'naïve enough,' and 'hoodwinked' by the defense arguments so that he 'can go home and have a good laugh at your expense.' " (*Id*. at p. 1529.) The appellate court concluded that the prosecutor's comments fell outside the permissible bounds of argument because they were "designed to offend and intimidate the potential holdout juror who doubted [the] defendant's guilt." (*Id*. at p. 1530.)

We do not agree that the prosecutor's "criminal mind" argument invited an irrational, purely emotional response from the jury or denigrated potential holdout jurors. The argument did not mention defendant's methamphetamine use. It did not urge the jury to draw inferences of guilt because defendant had a criminal mind or a generally bad character. Furthermore, the prosecutor was not claiming to be a psychological expert with special knowledge about the minds of criminals. The prosecutor merely commented, based on common experience, that law-abiding people would not have done what defendant did, i.e. fatally stabbed someone because they felt insulted.

Although prosecutors may not "offer their personal opinions when they are based solely on their experience or on other facts outside the record[] [citations]" (*Huggins*,

40

*supra*, 38 Cal.4th at p. 207), they may "ask the jury to believe the prosecution's version of events as drawn from the evidence." (*Ibid*.) They may also draw upon common experience and knowledge in making a closing argument. (See *People v. Brady* (2010) 50 Cal.4th 547, 584.)

In this case, the prosecutor drew on common experience to, in essence, comment that, while law-abiding people do not kill even when offended, some people do act on their feelings or thoughts, perhaps due to impulsivity, anger problems, or poor judgment, and the result is criminal conduct. That argument was within the permissible bounds of vigorous argument insofar as it suggested that defendant acted out of unchecked anger because he felt insulted.

Even assuming the prosecutor's brief references to "[t]he criminal mind" and "right-thinking people" were improper, defense counsel may have made a reasoned tactical decision not to draw greater attention to them by interposing an objection. In any case, given the brevity of the remarks, the strength of the evidence of guilt, and the instructions to the jury, there is no reasonable probability that the jury's verdict would have been more favorable if defense counsel had objected to the prosecutor's "criminal mind" argument and requested admonishment of the jury. (*Strickland*, *supra*, 466 U.S. at p. 694.)

j. *Argument Regarding Justice*

The prosecutor ended his rebuttal argument with remarks concerning justice: "[T]here's been a lot of talk [about the] presumption of innocence, reasonable doubt. There's one word that has not been mentioned at all in this trial . . . . That's the word justice. Justice for Mr. Nava and justice for [defendant]. In the civil courts we have money to compensate for wrong doing. The currency in the criminal courts is justice."

Defendant asserts that the prosecutor suggested that "the jurors bore some responsibility to use their ability to render a guilty verdict to compensate the victim" and that the prosecutor's suggestion constituted misconduct. He claims that the argument

41

violated the trial court's pretrial ruling precluding the parties from referring to the penalty or punishment. He also asserts that the argument "exerted blatant pressure on the jurors" to feel sympathy for the victim and to compensate the victim by reaching a guilty verdict.

As already indicated, it is not proper to urge the jury to consider a defendant's possible punishment in the guilt phase. (See *Holt*, *supra*, 37 Cal.3d at p. 458.) In addition, "an appeal to the jury to view the crime through the eyes of the victim is misconduct at the guilt phase of trial; an appeal for sympathy for the victim is out of place during an objective determination of guilt." (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1057, revd. on other grounds in *Stansbury v. California* (1994) 511 U.S. 318.)

But defendant mischaracterizes the prosecutor's remarks. The prosecutor made no reference to the punishment if defendant were convicted. His argument did not ask the jury to reach a guilty verdict out of sympathy for the victim. (See *People v. Kipp* (2001) 26 Cal.4th 1100, 1129 [misconduct where prosecutor in murder trial invited jury to consider that the victim was " '[a] living, breathing human being [who] had all of that taken away' "]; *People v. Fields* (1983) 35 Cal.3d 329, 362 [misconduct where "[t]he prosecutor invited the jury to depart from their duty to view the evidence objectively, and instead to view the case through the eyes of the victim"].) The prosecutor "did not suggest 'that emotion may reign over reason' or invite 'an irrational, purely subjective response.' (*People v. Lewis* (1990) 50 Cal.3d 262, 284.)" (*Seumanu*, *supra*, 61 Cal.4th at p. 1343.)

Immediately before appealing for justice, the prosecutor argued that an interpretation of the evidence in favor of a not-guilty verdict was unreasonable. Viewed in context, the prosecutor's appeal to the jurors' sense of justice for both the victim and defendant asked for a just verdict of guilty based on the evidence.

Even assuming that the prosecutor's request for justice constituted misconduct to which defense counsel should have objected, defendant has not shown any prejudice sufficient to establish an ineffective assistance of counsel claim. Even before hearing any

42

testimony, the trial court instructed the jury: "It is your exclusive duty to decide all questions of fact submitted to you, and apply the law which I give to you to the facts as you find them. [¶] You must decide the facts from the evidence received in this trial and not from any other source. . . . You must not be influenced in your decision by mere sentiment, conjecture, sympathy, passion, or prejudice toward any party, witness, or attorney in this case, or public opinion, or public feeling." The court told the jury: "Remember that attorneys are not witnesses. Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys will discuss the case, but their remarks are not evidence. . . . [¶] Since it is your duty to decide the case solely on the evidence which you see and hear in this case, you must not consider as evidence any statement of any attorney made during the trial."

After the attorneys' closing arguments, the trial court again instructed the jury. It instructed the jury on the People's burden to prove guilt beyond a reasonable doubt. It stated: "In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial." The court specifically told the jury: "You must decide what the facts are. It is up [to] all of you and you alone to decide what happened based only on the evidence that has been presented to you in this trial. [¶] Do not let bias, sympathy, prejudice or public opinion influence your decision." As to attorneys' statements, the court instructed: "Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence." The jurors were told: "Your role is to be an impartial judge of the facts, not to act as an advocate for one side or the other." The court admonished the jurors that they "must reach [their] verdict without any consideration of punishment."

Defendant has not shown that the alleged misconduct was prejudicial. In *Medina*, *supra*, 11 Cal.4th 694, "the prosecutor asked the jury to 'do the right thing, to do justice, not for our society, necessarily or exclusively, but for [the victim], an 18 year-old boy

43

who was just working at a gas station one night.' " (*Id*. at p. 759.)  The Supreme Court could "see no reasonable probability that the prosecutor's brief and isolated comments could have influenced the jury's guilt determination." (*Id*. at p. 760.)  In this case, there is no reasonable probability that defendant would have obtained a more favorable result if defense counsel had objected to the prosecutor's appeal for justice and requested a curative admonition.  (*Strickland*, *supra*, 466 U.S. at p. 694.)

k. *No Federal Due Process Violation*

Defendant asserts the persistent prosecutorial misconduct so infected the trial with unfairness that, as a matter of federal due process, the judgment must be reversed.   It is true that "a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error. [Citations.]" (*Hill*, *supra*, 17 Cal.4th at pp. 844-845.)  The alleged misconduct by the prosecutor was not, however, "so extreme or so divorced from the record that they could not have been cured by prompt objections and admonitions.  (*People v. Murtishaw* (1981) 29 Cal.3d 733, 759, fn. 21.)" (*People v. Carrera* (1989) 49 Cal.3d 291, 320.)  Since defense counsel did not object to the alleged prosecutorial misconduct and request judicial admonitions, and since such admonitions would have cured any harm, defendant forfeited his claims of prosecutorial misconduct.  (See *Seumanu*, *supra*, 61 Cal.4th at p. 1332; *People v. Benavides* (2005) 35 Cal.4th 69, 108 (*Benavides*).)

Even if the due process contention had been preserved for review, we would reject it on the merits.  When the alleged prosecutorial misconduct is considered in the context of the entire proceeding, it is clear that the challenged remarks during closing argument, whether considered individually or together, did not so infect "the trial with unfairness as to make the resulting conviction a denial of due process." (*Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643.)  Neither has defendant established the requisite prejudice for an ineffective assistance claim predicated upon defense counsel's failure to object to the

allegedly pervasive prosecutorial miscounduct on constitutional grounds. (*Strickland*, *supra*, 466 U.S. at p. 694.)

B. *Exclusion of Evidence*

Defendant contends that he was denied due process under the Sixth and Fourteenth Amendments to the United States Constitution when the court excluded defense rebuttal evidence showing that he had no criminal history or history of violence. He asserts that "[s]ince the state was the first party to introduce bad character evidence of drug addiction which it linked to anger, violence, premeditation, and deliberation, the defense should have at least been allowed to counter with the fact that [he] was not a person with a propensity to act violently and lie about it, even if he was a drug addict." Defendant argues that "[t]he absence of a criminal record has a 'tendency in reason' to, among other things, corroborate [his] 'truthfulness' when he described to Detective Carlin that something unusual had happened to his mind and that he experienced a level of anger he could not explain."

In this case, the prosecution brought a motion in limine to exclude any reference to defendant's lack of a criminal record at trial on the ground such evidence was irrelevant. The motion was taken under submission, but apparently the court never ruled on it.

During the testimony of Detective Carlin, a juror proposed the following question for him: "Has [defendant] ever been arrested before this?" The court did not ask the juror's question.

During defendant's testimony on his own behalf, the court stopped defendant from answering defense counsel's question whether defendant had ever been arrested or convicted of a violent felony in Mexico or the United States. There was an unreported side bar discussion.

When defendant was testifying, jurors proposed questions to be asked of defendant, but the court declined to ask two of those questions. One of the unasked questions was "Do you get mad easily? Have you been in a fight before?" The other

unasked query was "Have your family – wife children ever made you mad? [H]ow do you react[,] how did you handle those situations?"

On the record, the court indicated that the unasked juror questions were irrelevant or improper "character evidence about [defendant's] tendency to get mad easily" or his propensity for "getting in fights." Defense counsel argued that the unasked questions were related to his question whether defendant had been convicted of a violent felony, which he thought was "a fair question" because the prosecutor "would certainly ask that question" if defendant "had a felony conviction." Defense counsel asserted that the lack of conviction of a violent felony was relevant, and that it was important for the jurors' questions to be asked.

The court responded on the record that, during the unreported sidebar conference following defense counsel's question regarding defendant's prior arrest for or conviction of violent felonies, it had disallowed the question because it was irrelevant. The court considered CALCRIM No. 226, which concerns witness credibility, and it determined that only a conviction, as opposed to the lack of conviction, was relevant to credibility. The court also indicated that even if reputation or opinion evidence of defendant's character were allowed, defendant could not testify as to his own character such as by indicating he had no prior convictions.

First, defendant has not shown that the trial court erred in excluding defendant's testimony regarding whether he had a history of arrest for, or conviction of, violent felonies on the ground that the evidence was irrelevant. "Relevant evidence" is "evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action," "including credibility."[10] (Evid.

_____

[10] Evidence Code section 1100 provides: "Except as otherwise provided by statute, any otherwise admissible evidence (including evidence in the form of an opinion, evidence of reputation, and evidence of specific instances of such person's conduct) is admissible to prove a person's character or a trait of his character." "[Evidence Code] (continued)

46

Code, § 210.)  "Evidence is irrelevant, however, if it leads only to speculative inferences. (See *People v. Kraft* (2000) 23 Cal.4th 978, 1035.)"  (*People v. Morrison* (2004) 34 Cal.4th 698, 711.)  "The trial court has broad discretion in determining the relevance of evidence, but lacks discretion to admit irrelevant evidence.  (See *People v. Crittenden* (1994) 9 Cal.4th 83, 132.)"  (*Benavides*, *supra*, 35 Cal.4th at p. 90; see Evid. Code, § 350.)  The court acted within its discretion in determining that defendant's lack of a history of being arrested for, or convicted of, violent felonies was irrelevant to his purported character for nonviolence or truth telling.  (See *People v. Jablonski* (2006) 37 Cal.4th 774, 821.)

Second, defendant has not shown that the prosecution relied on the evidence of defendant's methamphetamine use to attack his character for truthfulness[11] or to show that he had a propensity to commit violent crimes.  Rather, the prosecution's theory was that defendant's motive for stabbing Nava was anger, and that the evidence tended to show such motivation.

---

[s]ection 1100 is technically unnecessary because [Evidence Code] [s]ection 351 declares that all relevant evidence is admissible."  (Cal. Law Revision Com. com., 29B pt. 3B West's Ann. Evid. Code (2009 ed.) foll. § 1100, p. 213.)  Evidence Code "[s]ections 1101-1104 substantially restrict the extent to which character evidence may be used as *circumstantial evidence of conduct*."  (*Ibid*.)  Nothing in Evidence Code section 1101, however, "affects the admissibility of evidence offered to support or attack the credibility of a witness."  (Evid. Code, § 1101, subd. (c).)  Thus, Evidence Code section 1101, "subdivision (a)'s restrictions on evidence have no application where . . . the evidence relates to a witness's credibility."  (*People v. Abel* (2012) 53 Cal.4th 891, 929.)

[11] "A witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under Evidence Code section 352.  [Citations.]"  (*People v. Clark* (2011) 52 Cal.4th 856, 931, fn. omitted.)  Defendant's mere personal use of methamphetamine did not necessarily involve moral turpitude.  (See *People v. Castro* (1985) 38 Cal.3d 301, 317 ["simple possession of heroin does not necessarily involve moral turpitude"].)

Third, the record does not reflect that, aside from defendant's asserted history of not being arrested or convicted of violent felonies, the defense attempted to introduce any evidence that defendant had no history of violence.  By declining to ask questions propounded by jurors, the court was not excluding defense evidence.  Defendant forfeited any claim concerning that exclusion of evidence by not seeking to introduce additional evidence that he lacked a history of violence.  (See Evid. Code, § 354, subd. (a) [an erroneous exclusion of evidence is generally not reversible unless the error resulted in a miscarriage of justice and "[t]he substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means"]; *In re Seaton* (2004) 34 Cal.4th 193, 198 ["[A]s a general rule, 'the failure to object to errors committed at trial relieves the reviewing court of the obligation to consider those errors on appeal.' [Citations.]"]; *People v. Samayoa* (1997) 15 Cal.4th 795, 827 ["Because no ruling was actually made below, 'no review can be conducted here.' [Citations.]"]; *People v. McPeters* (1992) 2 Cal.4th 1148, 1179 [ordinarily, "the absence of an adverse ruling precludes any appellate challenge"].)  Further, since the trial court did not rule on the admissibility of such defense evidence, there is no basis for reaching a due process claim that an erroneous evidentiary ruling "had the legal consequence of violating due process." (*People v. Partida* (2005) 37 Cal.4th 428, 431.)

Fourth, in any case, evidence of a defendant's character of nonviolence to show his conduct in conformity with his character is admissible only in the form of an opinion or reputation evidence.  Evidence Code section 1101, subdivision (a), generally makes evidence of a person's character or a trait of character—whether in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct— inadmissible to prove the person's conduct on a specified occasion.  Evidence Code 1102

48

is an exception to the foregoing rule.[12]  (Evid. Code, § 1101, subd. (a).)  Under Evidence Code section 1102, subdivision (a), "[i]n a criminal action, evidence of the defendant's character or a trait of his character *in the form of an opinion or evidence of his reputation* is not made inadmissible by [Evidence Code] [s]ection 1101 if such evidence is . . . [¶]  [o]ffered by the defendant to prove his conduct in conformity with such character or trait of character."  (Italics added.)  While we recognize that "evidence of the character of the defendant . . .—though weak—may be enough to raise a reasonable doubt in the mind of the trier of fact concerning the defendant's guilt" (Cal. Law Revision Com. com., 29B pt. 3B West's Ann. Evid. Code (2009 ed.) foll. § 1102, p. 312), evidence of specific instances of a defendant's conduct is not included within that exception to Evidence Code section 1101, subdivision (a).  In this case, the trial court did not abuse its discretion by not asking the jurors' questions related to defendant's behavior on other occasions.  (See *Doolin*, *supra*, 45 Cal.4th at p. 437 [evidentiary rulings under Evid. Code §§ 1101 and 1102 are reviewed for abuse of discretion].)

Fifth, even if defendant's evidentiary due process claim were preserved for review, we would reject it.  Although "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense," the accused is required to "comply with

---

[12] In 1982, the voters approved Proposition 8 (approved June 8, 1982), which added the constitutional "Right to Truth-in-Evidence" provision that is now found in California Constitution, article I, section 28, subdivision (f)(2).  The provision, which generally requires the admission of relevant evidence in a criminal proceeding, provides in pertinent part: "Right to Truth-in-Evidence.  Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding . . . .  Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code Sections 352, 782 or 1103."  "[E]ven if the adoption of [the "Truth in Evidence" provision] abrogated Evidence Code section 1101, the Legislature reenacted that statute when it amended it in 1986 by more than a two-thirds vote."  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393.)  "Since section 1101 expressly refers to section 1102 as an exception to it, the latter statute also survives intact."  (*People v. Felix* (1999) 70 Cal.App.4th 426, 432.)

established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." (*Chambers v. Mississippi* (1973) 410 U.S. 284, 302 (*Chambers*).) A defendant's "right to present relevant testimony is not without limitation." (*Rock v. Arkansas* (1987) 483 U.S. 44, 55; see *Taylor v. Illinois* (1988) 484 U.S. 400, 410 ["The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."].) "*Chambers* . . . does not stand for the proposition that the defendant is denied a fair opportunity to defend himself whenever a state or federal rule excludes favorable evidence." (*United States v. Scheffer* (1998) 523 U.S. 303, 316 (*Scheffer*).)

"As a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.' [Citations.] Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense. [Citation.]" (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103.) Defendant has not established that the evidence that he alleges was improperly excluded "significantly undermined fundamental elements of [his] defense" (*Scheffer*, *supra*, 523 U.S. at p. 315) or otherwise resulted in a denial of due process.

C. *Alleged Instructional Error*

1. *Failure to Instruct on the Effect of Provocation on the Degree of Murder*

Defendant argues that the court had a sua sponte duty to instruct that provocation could reduce the degree of murder because it instructed that provocation could reduce murder to manslaughter. He contends that the court's failure to give such instruction violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution and defense counsel's failure to request it constitutes ineffective assistance.

In *People v. Rogers* (2006) 39 Cal.4th 826 (*Rogers*), a case cited by both defendant and the People, the defendant was convicted of first degree murder of one

50

woman and second degree murder of another woman. (*Id*. at p. 835.) The court instructed the jury on voluntary manslaughter under a heat of passion theory. (*Id*. at pp. 882, 884.) The defendant asserted that "the trial court erred in failing to instruct on its own motion that provocation inadequate to reduce a killing from murder to manslaughter nonetheless may suffice to negate premeditation and deliberation, thus reducing the crime to second degree murder. [Citations.]" (*Id*. at pp. 877-878.) The Supreme Court determined: "[U]nder the principles expressed in CALJIC No. 8.73, provocation is relevant only to the extent it 'bears on the question' whether defendant premeditated and deliberated. [Citation.] Because CALJIC No. 8.73 relates the evidence of provocation to the specific legal issue of premeditation and deliberation, it is a 'pinpoint instruction' as that term was defined in *People v. Saille* [(1991)] 54 Cal.3d [1103,] 1119-1120, and need not be given on the court's own motion. [Citations.]" (*Id*. at pp. 878-879.)

CALCRIM No. 522 is comparable to CALJIC No. 8.73. CALCRIM No. 522 provides in pertinent part: "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter]. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.]" (CALCRIM No. 522 (Revised April 2011).)

Defendant invokes the principle that "[e]ven if the court has no sua sponte duty to instruct on a particular legal point, when it does choose to instruct, it must do so correctly." (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015 (*Castillo*).) In *Castillo*, the defendant was charged with the murder of one person and the attempted premeditated murder of another person. (*Id*. at p. 1013.) The trial court gave a pinpoint instruction telling the jury that "it should consider defendant's voluntary intoxication in determining

51

whether he had the specific intent or mental state required for the charged crime." (*Id.* at p. 1014, fn. omitted.) The defendant in effect argued that "the pinpoint instruction did not pinpoint enough, that it did not additionally say that premeditation is a mental state." (*Id.* at p. 1014.) The Supreme Court determined that, under the instructions as a whole, "[a] reasonable jury would have understood deliberation and premeditation to be 'mental states' for which it should consider the evidence of intoxication as to either attempted murder or murder." (*Id.* at p. 1016.)

In this case, the trial court did not give a legally incorrect pinpoint instruction. Rather it gave no pinpoint instruction on provocation. The mere fact that the trial court instructed on the offense of voluntary manslaughter based on sudden quarrel or heat of passion, to which legally sufficient provocation is integral, did not trigger a sua sponte duty to give a pinpoint instruction under CALCRIM No. 522. (*Rogers*, *supra*, 39 Cal.4th at pp. 878-879.)

In *People v. Thomas* (2013) 218 Cal.App.4th 630 (*Thomas*), which defendant cites, the defendant was convicted of second degree murder. (*Id.* at p. 641.) The California Supreme Court granted the defendant's petition for review, and it "transferred his case back to [the appellate] court 'with directions to address [the] defendant's contention that the trial court's refusal to instruct on heat of passion voluntary manslaughter constituted federal constitutional error.' " (*Id.* at p. 633.) The appellate court then concluded that the trial court's "failure to instruct the jury on the potential effect of provocation to negate malice aforethought was federal constitutional error." (*Ibid.*) The court also suggested, in dicta, that "[a]lthough not requested, it also seems the jury should have been instructed under CALCRIM 522 that heat of passion could reduce the degree of murder." (*Id.* at p. 646.)

It is not plain that *Thomas* was suggesting that a trial court must instruct sua sponte with CALCRIM No. 522. In any case, we are bound by the Supreme Court's decision in *Rogers*, *supra*, 39 Cal.4th 826. (*Auto Equity Sales*, *Inc. v. Superior Court*

(1962) 57 Cal.2d 450, 456.) In *Rogers*, the Supreme Court explained: "In the absence of instructional errors such as were present in [*People v.*] *Valentine* [(1946) 28 Cal.2d 121], the standard manslaughter instruction is not misleading, because the jury is told that premeditation and deliberation is the factor distinguishing first and second degree murder. Further, the manslaughter instruction does not preclude the defense from arguing that provocation played a role in preventing the defendant from premeditating and deliberating; nor does it preclude the jury from giving weight to any evidence of provocation in determining whether premeditation existed. For the foregoing reasons, we hold that CALJIC No. 8.73 [comparable to CALCRIM No. 522] is a pinpoint instruction that need not be given on the court's own motion."[13] (*Rogers*, *supra*, at p. 880.)

The trial court's failure to instruct sua sponte under CALCRIM No. 522 was not tantamount to a failure to instruct on an element of the offense, which is an error subject to the standard of review under *Chapman v. California* (1967) 386 U.S. 18, 24. (See *Neder v. United States* (1999) 527 U.S. 1, 4.) Here, the jury was fully instructed on the People's burden of proof beyond a reasonable doubt and the requirements for proving first degree murder, under the alternative theories of premeditation and deliberation and lying in wait, and second degree murder. The jury was specifically told that murder was not proved unless the People met "the burden of proving beyond a reasonable doubt that the killing was not justified," "the burden of proving beyond a reasonable doubt that the defendant did not kill as a result of a sudden quarrel or in the heat of passion," and "the burden of proving beyond a reasonable doubt that the defendant was not acting in

---

[13] In *Valentine*, the trial court erroneously instructed that "(a) if the defendant possessed the specific intent to kill, the killing was first degree murder (thus blurring the distinction between first and second degree murder); and (b) the defendant bore the burden of raising a reasonable doubt as to the degree of the murder. (*People v. Valentine*, *supra*, 28 Cal.2d at pp. 130-134.)" (*People v. Rogers*, *supra*, 39 Cal.4th at p. 880.)

imperfect self-defense." The absence of an instruction under CALCRIM No. 522 did not reduce the state's burden of proof.

Alternatively, defendant urges us to find that defense counsel provided ineffective assistance by failing to secure an instruction under CALCRIM No. 522. Defense counsel may have reasonably decided not to request such instruction because he wanted the jury to use any evidence of provocation to reduce the killing from murder to manslaughter and he did not want an instruction suggesting that the alleged provocation might be insufficient to reduce the homicide to manslaughter. In any case, there is no reasonable probability that defendant would have obtained a more favorable result if the court had given CALCRIM No. 522 upon his counsel's request. (See *Strickland*, *supra*, 466 U.S. at p. 694.)

The jury was instructed that "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." It was also told that the duration of lying in wait "must be substantial enough to show a state of mind equivalent to deliberation or premeditation." The court's instructions did not prevent defense counsel from arguing that provocation affected defendant's intent and mental state. After discussing premeditation and deliberation, defense counsel asserted that "[t]his is at best a heat of passion, provocation case." In addition to its complete instructions on the charged and lesser offenses, the court instructed the jury: "You must decide whether a fact and issue has been proved based on *all of the evidence*." (Italics added.)

The evidence of verbal or physical provocation was very weak. Defendant's testimony at trial about a fight started by Nava was not consistent with his statements to police following the stabbing. According to defendant's testimony at trial, as he was walking toward defendant in the kitchen, Nava said, "You're going to beat me up or something fagget [*sic*]" or "queer." He testified that Nava looked like he was "trying to puff his chest out." At trial defendant described a fight in the kitchen instigated by Nava,

54

who kicked him in the shin and punched him in the nose. Defendant testified that he hit Nava in the jaw with a closed fist, that Nava grabbed an empty beer bottle and hit him over the head with it, and that Nava held the bottle by the neck as if Nava intended to hit defendant again.

But defendant had not said anything about a fight occurring before the stabbing during the police interviews. After the incident, defendant indicated that he was not hurt. The officer who photographed defendant after the incident did not see any injuries on defendant's face, head, or elsewhere on his body aside from a small abrasion. None of the witnesses interviewed by Detective Carlin following the incident, including defendant's five-year-old son and his six-year-old friend who both testified for the defense, told the detective that he or she saw Nava hit defendant over the head with a beer bottle. No empty bottle was found in the vicinity of the supposed fight. Defendant acknowledged at trial that, after the stabbing, he did not tell anybody that a bottle had been broken over his head. He conceded that despite opportunities to report the fight with Nava to police, he never did. He testified that, when he grabbed the knife, he intended to hurt Nava, he was angry, and he knew that using a knife that large could kill Nava. None of the adult witnesses corroborated defendant's testimony that Nava verbally mocked or physically attacked him.

Defendant has not established an ineffective assistance of counsel claim based on his counsel's failure to request instruction pursuant to CALCRIM No. 522. (See *Strickland*, *supra*, 466 U.S. at p. 694.)

2. *Allegedly Incorrect Instruction Pursuant to CALCRIM No. 520*

Defendant asserts that his rights under the Sixth and Fourteenth Amendments to the United States Constitution were violated when the court instructed pursuant to CALCRIM No. 520 but failed to add language, on its own motion, that it was "the prosecution's burden to disprove self-defense and voluntary manslaughter as elements of murder."

55

The trial court instructed pursuant to CALCRIM No. 520: "The defendant is charged in Count I with murder, in violation of Penal Code section 187. [¶] To prove the defendant is guilty of this crime, the People must prove that: [¶] One, the defendant committed an act that . . . caused the death of another person; [¶] And two, when the defendant acted, he had a state of mind called malice aforethought." The court omitted the instruction's bracketed language stating a third element to be read when instructing on justifiable or excusable homicide: "[AND [¶] 3. (He/She) killed without lawful (excuse/[or] justification).]" (CALCRIM No. 520 (Revised August 2013).)

Defendant maintains that the court should have instructed with CALCRIM No. 520's bracketed language related to self-defense and with additional language requiring the People to prove that defendant did not kill in the heat of passion or in imperfect self-defense. Defendant acknowledges that substantially similar language was included in other instructions given to the jury, but he argues that those instructions were not sufficient to cure the deficiencies of the instruction pursuant to CALCRIM No. 520 because "[t]here is no basis to presume that the jury correlated" the instructions, especially since the prosecutor told the jury, in discussing the verdict forms, that "[t]he only way you get to decide if it's voluntary manslaughter is if you all agree that it's not murder one or murder two," and since the prosecutor allegedly indicated that the jury could ignore the manslaughter instructions. Defendant suggests that the instruction as given violated his right to due process under the federal Constitution by reducing the prosecution's burden of proof.

Defendant relies on *Mullaney v. Wilbur* (1975) 421 U.S. 684 (*Mullaney*) to argue that CALCRIM No. 520 should state "the state's burden to disprove voluntary manslaughter as a separately numbered, bracketed element within the murder instruction(s) along with the other required and bracketed elements." In *Mullaney*, the United States Supreme Court considered a Maine law that required "a defendant to establish by a preponderance of the evidence that he acted in the heat of passion on

56

sudden provocation in order to reduce murder to manslaughter." (*Mullaney*, *supra*, at p. 703.) The court held that "the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." (*Id*. at p. 704.) Defendant also cites *People v*. *Rios* (2000) 23 Cal.4th 450, in which the California Supreme Court stated: "If the issue of provocation or imperfect self-defense is thus 'properly presented' in a murder case (*Mullaney v*. *Wilbur* (1975) 421 U.S. 684, 704), the *People* must prove *beyond reasonable doubt* that these circumstances were *lacking* in order to establish the murder element of malice. (*Id*., at pp. 703-704; *People v*. *Bloyd* (1987) 43 Cal.3d 333, 349.)" (*Id*. at p. 462.)

" '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citations.]" (*People v*. *Carrington* (2009) 47 Cal.4th 145, 192; see *People v*. *Thomas* (2011) 52 Cal.4th 336, 356 ["A single jury instruction may not be judged in isolation, but must be viewed in the context of all instructions given."]; *Estelle v*. *McGuire* (1991) 502 U.S. 62, 72 [An "instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record. [Citation.]"].) " 'The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole.' [Citation.]" (*People v*. *Burgener* (1986) 41 Cal.3d 505, 539, disapproved on another ground in *People v*. *Reyes* (1998) 19 Cal.4th 743, 756.)

" 'The relevant inquiry [when instructional error is claimed] is whether, "in the context of the instructions as a whole and the trial record, there is a reasonable likelihood that the jury was misled to defendant's prejudice." [Citation.] Also, " ' "we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." ' " ' [Citations.]" (*People v*. *O'Malley* (2016) 62 Cal.4th 944, 991.) In addition, absent some contrary indication in the record, "we generally

57

presume that jurors are capable of following, and do follow, the trial court's instructions." (*People v. Bryant*, *Smith and Wheeler* (2014) 60 Cal.4th 335, 447; see *People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17 ["The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions."].)

We presume the jury understood, correlated, and applied all of the instructions, which together properly stated the law. We do not agree with defendant that the prosecutor's arguments undermined our presumption. The court told the jurors to "[p]ay careful attention to all of these instructions and consider them together." We have no sound reason to believe they did not do so. The instruction pursuant to CALCRIM No. 520, considered in the context of the instructions as a whole, did not constitute federal constitutional error.

Defendant maintains that a discussion of CALCRIM No. 570, the heat-of-passion voluntary manslaughter instruction, between the trial court and attorneys outside the presence of the jury establishes that the instructions were confusing. The final paragraph of CALCRIM No. 570 provided: "The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder." (CALCRIM No. 570 (Rev. Feb. 2014).) The court expressed the view that the final sentence of that instruction should read: "If the People have not met this burden, you must find the defendant not guilty of murder, but guilty of voluntary manslaughter." Plainly, the court was concerned that the standard instruction did not make clear that the jury could convict defendant of voluntary manslaughter if it found that the People had not met their burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. The court's remarks do not support defendant's view that the instructions as given did not adequately convey that, in order to find defendant guilty of murder, the prosecution had

the burden of proving beyond a reasonable doubt that the killing was not justified, that the defendant did not kill as a result of a sudden quarrel or in the heat of passion, and that the defendant was not acting in imperfect self-defense.

Defendant alternatively contends that his trial counsel rendered ineffective assistance of counsel by failing to request a complete instruction "on all of the elements of murder together in CALCRIM No. 520." As explained, the instructions as a whole adequately instructed on the prosecution's burdens of proof to prove murder. There is not a reasonable probability that defendant would have obtained a more favorable result if the court had instructed, within the context of that single instruction, on the prosecution's burdens of proof. (*Strickland*, *supra*, 466 U.S. at p. 694.)

D. *Cumulative Effect of Alleged Errors*

Defendant argues that the cumulative effect of multiple errors requires reversal of the judgment because the "combined errors fail the 'litmus test' of a fair trial." We disagree. Defendant has not established that he received ineffective assistance of counsel or that there was pervasive prosecutorial misconduct rendering the trial fundamentally unfair. We did not find that the trial court abused its discretion in excluding evidence or instructing the jury. Defendant has not demonstrated that he received an unfair trial due to the cumulative effect of the asserted errors. (Cf. *Hill*, *supra*, 17 Cal.4th at p. 815 [the cumulative prejudice flowing from the combination of outrageous and unethical prosecutorial misconduct and other errors rendered the trial fundamentally unfair].)

DISPOSITION

The judgment is affirmed.

59

_____

ELIA, ACTING P.J.

WE CONCUR:



_____

BAMATTRE-MANOUKIAN, J.



_____

MIHARA, J.